It is an appeal from a judgment after trial in the Southern District of New York. Mr. Dragseth, are you prepared to begin? I am, thank you. Okay. You may go ahead. Thank you. May it please the Court, late in the week and I think this case has been fully briefed, so I want to focus on points that I think can get the Court to resolution of the case quickest and as quickly as possible. So with that, I would plan to start with the claim construction issue because I think it's the fastest way and easiest way to resolve the issues in this case. Mr. Dragseth, this is Judge Taranto. Continuing with your interest in getting to at least what is currently on my mind, assume for purposes of this question that we agree with your claim construction point. Remand? Reversal? Why reversal if reversal? Reversal because the issue of infringement was fully briefed. SIMO has showed you a site in the record that they think they have. We have pointed out that the expert on that point merely was talking generally and then when it was pointed out to him that a hotspot doesn't have a phone in it, he agreed with that. And so we don't think that's the one point that they've pointed to for remand. So I think I understand that. There's this one question and answer in which Dr. Clark isn't even definitive in saying, or yes, he thinks there is a non-local calls database, and maybe the absence of such an affirmative declarative assertion is enough. I frankly don't understand your point about how at least three of the four devices do not have phone call capabilities fits into this reversal versus remand. I'm not even sure I know what a phone call is. Well, that's a good question, Your Honor. The point there that we're trying to make, and I don't want to push too hard on this point about reverse versus remand, but the point to answer your question, these are hotspots. I have one from Verizon. I'm sorry. I thought G2, G3, U2 or U something were hotspots, but S1 was not. Right. And so our point isn't that S1 isn't a phone. It's just that they, in their brief, didn't point out. It's about S1. And what's the relevance under the claim of whether a device can, as you say, make a phone call? If you agree with our claim construction, you need to have a non-local call database, and that is something that you would use for a phone call. There would be no reason to have that on a hotspot. Now, go ahead. Sorry. No, I didn't say anything. Okay. More generally, there may be something more that's in their brief. I'm not trying to say that you must reverse in this situation. No, I don't think that there is anything more in their brief, but there's like a paragraph on each side about this, which left me pretty uncertain. When I looked at the summary judgment papers, they made a motion for summary judgment, which Judge Rakoff granted. You made a motion for summary judgment, which Judge Rakoff denied. And you said in your motion for summary judgment, this preamble is limiting and what's more, it actually requires a non-local calls database. And if you, the judge, agree with that, then there are no non-local call databases in the accused product. They came back with only this little passage from Dr. Clark. And I'm trying to understand. And they didn't say we need more discovery. They didn't say we need claim construction on non-local calls database. And I'm trying to understand if on this assumption of the claim, you're being right on the claim construction, that properly ends the case or not. It makes a big difference because it changes whether we need to address the other issues. Right. And I think you've laid it out very well why the court can just reverse, because it was fully briefed. It was on summary judgment. If they had a factual dispute at the time, of course, the summary judgment procedure compels them to put that factual dispute in place. But I would think that, at a minimum, there needs to be some explanation beyond what's in the brief to explain why we would, even apart from procedure and the summary judgment rules, why we would want to or need to go down and spend more resources, both the parties and the district court's resources. Counsel, they quote Dr. Clark as saying, it depends on how you construe the non-local calls database as to whether I would believe or whether I would opine that the allegedly infringing devices do or do not have one. And so does that mean that there needs to be a claim construction that we shouldn't be doing in the first instance? He's getting, if you read through that, he's getting pretty broad with his implied construction there, I think, because I think he refers to data calls. In other words, if it doesn't have anything to do with a telephone, a voice, I think what he's saying there, if you read it, he's saying, well, if non-local calls database doesn't have anything to do with voice or it doesn't have to deal with voice calls, it can deal with data calls, which is completely different than what the patent is talking about. I think that's what's going on there with that testimony. But I don't think that's even a tenable construction. If you look at the bottom of column 15 of the patent, they talk about the non-local call database. It's all only and exclusively about telephone calls. That's what call means. Certainly, if you're talking about, you've probably had other cases, if you were talking about memory, right, and the CPU can make a call to memory and get some data back. But that's not what this patent is talking about. So he can't get – there's no support to go that broad. This is Judge Wall. Let me take you somewhere else for a moment. On page 1 of the Gray Brief, you assert that, I'm quoting, CIMO's trial theory on a series of non-responses, Fifth Amendment, by the way, by an individual, Wong Bin, who chose to invoke the Fifth Amendment. While a jury was entitled to draw reasonable inferences, there is nothing linking Mr. Bin's non-responses to the 689 patent. My understanding is that Mr. Bin was a Cloudlink subsidiary employee. I think that's right. Okay. Isn't there a legitimate adverse inference when an employee declines to answer a specific question, whether or not they assert the Fifth? Okay. So, yes, there is, but we have to say, well, what is the adverse inference? And the adverse inference has to be that the response to that particular question. You can't just say, well, he took the Fifth, so we can have an adverse inference against him as a bad person. It has to be that his answer to that question would have been bad, and the questions he got were questions of the form, you know, is this filed? They had 14 files on his laptop. Did you put this file on your laptop? He took the Fifth. The adverse inference you get from that is, sure, he put the file on his laptop, but that doesn't have anything to do with the patent in this case. They asked him, did you use these files to prepare your patents? And he took the Fifth. So an adverse inference you might be able to get from that question is, okay, he used those files to prepare his own patents. Nothing in there jumps the gap over to the 689 patent or even the 735 patent. But didn't the court say it's relevant as it relates to whether or not it constitutes circumstantial evidence of a pattern of copying? In other words, you don't have to necessarily tie that particular piece of evidence to the particular patent if it establishes a pattern or helps to establish a pattern. First, it's not a pattern of copying patents, and I don't want to go too deep into that because that's not the ultimate point. The ultimate point is that, yes, it could be to show that bad faith, let's say, just general bad faith. But if there's no evidence that we knew about this patent, or no inference, no reasonable inference that anybody knew, and nothing about Mr. Bin has anything to do with either the 735 or the 689 patent, and there's nothing about him searching or doing anything with third-party patents. So, yes, you could use, if you had evidence that we knew about the 689 patent, maybe you could use Mr. Bin to say, well, we're bad guys, something like that, to get the intent element. But you have to separately hook that up and say, well, okay, there was bad intent, but even with the bad intent, there's no evidence of knowledge of the patent. Can we go back to the primary question, which is the claim construction issue? Sure. Do you believe that requiring a plurality of each of the elements requires more than one of each element in the claim devices, as in both two or more non-local called databases? I think so. I think that's the natural reading. We rely on superguide. Superguide was one or more. Plurality means two or more. If you apply superguide with a slight adjustment, changing one or more to two or more, I think that's the ordinary meaning of the claim. Well, I mean, is there anything in the specification that would support the proposition that you need multiples? So two points on that, yes, and I'll tell you in a minute. And there is more than what supports our opponent's claim construction. So two points, two places in the spec you can look for that. First off, in columns 14 and 15, our opponent has cited those passages quite a bit, and it's where they lay out all of these kind of generic computer components. They do talk about one or more. What does one or more mean? Well, the more part of one or more is two or more. Right, but it also allows for one, right? It does allow for one, but you don't have to hit everything. You don't have to claim all possibilities. This is not a situation where you have, you know, a preferred embodiment, a separate invention in the specification. What you're saying is there's an optional thing here. You could have one. You could have two. You could have three. And then if you want to take that option in a claim, you can't claim an option, right? You can't claim all of that. You can't because if you do that, then it's just open-ended to all of that. So you are allowed, though, to carve off part of an option in your claim, and the briefing has plenty of discussion about how this is a con from a previous patent and other claims in this patent and in the parent patent deal with that. I will say, though, we have the only ordinary meaning claim construction in this case. So if you want in hoc verba match to that ordinary meaning, you can go to the summary of this patent, and there is an in hoc verba match between claimate and it's about halfway down the summary column where they do the practice of copying the claim. And so if you believe that this is the ordinary meaning of this language, then there is disclosure in the specification, not in the classical way that people do it, but there is disclosure in the specification that matches that. So we don't have a situation where there's some sort of impossible conflict between the specification and the claims. Can I just ask you, the summary paragraph is a little bit long. Is that written in such bad English as the claim? Yes. Okay. So now that I've had a chance to open it while you said that, it's starting at line 25 of column 3. Right. It's a long paragraph. Yes. And I heard a beep, and so I will reserve it if there aren't any other questions. We'll give you the full three minutes for rebuttal. Thank you, Chief Judge. Oh, that's a nice promotion. Oh, sorry. Okay. I'll take it. All right. Let's hear from the other side. All right. May it please the Court, this is Ben Reed, Your Honor, from K&L Gates, on behalf of SEMA Holdings, Inc. We submit that the trial court was correct on all issues now on appeal, claim construction and otherwise, under all the pertinent standards of review. To turn first to the claim construction issue, the trial court was correct when it determined that the claims do not require a non-local cause database to be satisfied. That feature is not necessary under a plain English interpretation of the claims, and as an optional feature, it is not, quote, essential structure, so the claims are, quote, structurally complete under this court's precedent, even without that element as part of the claims. Is the claim construction, I mean, is the claim language ambiguous in your mind? It is not, Your Honor. In our view, the plain language of the claim is clear in the sense that the preamble list is a list of six items separated by the word and, preceded by the phrase plurality of. So in our view, the plain language of that is, if two or more of the six elements are present, the preamble list would be met to the extent that it's a limitation. And in our view- This is Judge Taranto. Where I get hung up on that is in the language that immediately follows, at least one of the plurality of programs, blah, blah, blah, the plurality of processors. It seems to me that with the garbled language that comes before, at least, the language after leaves it unambiguous that at least two of those items in the previous list have to have themselves, there have to at least be a plurality of those, which then tells me, okay, this is the word plurality in the first part is, in fact, distributed over and, therefore, applies to each of the items in the list. Your Honor, I agree. The claim is not all that clearly written, but in our interpretation of the last phrase of the claim, the part that comes after the preamble list from the briefs, what it's saying there is that at least one of the plurality of programs, so there must be at least two programs, which the list element makes clear because it says programs, at least one of those programs has instructions that can be executed to do certain things in the claims. So it's not inconsistent. It may be a little bit wordy, but it is not inconsistent with the way the preamble list is written as to the way the rest of the claim element is written in the preamble. And I think Judge O'Malley made the point with my counterpart that the interpretation that the plaintiff or that the defendant here, that you cloudlink advocates, where a plurality of precedes each of the elements of the preamble list is wrong for a number of reasons. The first of which, again, Judge O'Malley highlighted, which is there is no disclosure in the specification of a plurality of non-local cause databases. Figure 5B shows what the non-local cause database looks like. That is an optional feature. There's no dispute between the parties about that fact. But there's no disclosure about how one might use multiple non-local cause databases in the invention claimed in Claim 8. This court's precedent, for example, in Ruckus Wireless versus Innovative Wireless, which is 824 Fed 3rd 999, counseled against construing claims in a way to violate the written description requirement. And that's exactly what you cloudlink construction would do. There would be no written description for a plurality of non-local cause databases. And so, therefore, this court's precedent counseled against that. The other problem with you cloudlink's proposed construction is that it  As we made clear in our briefing, that would exclude embodiments of the 689 patent where the non-local cause database is explicitly described as an optional component of the device. But don't you have the, what's your response, though, to the fact that Claim 19, the method claim, is a completely different system that's discussed. And so there you don't have to worry about whether it's optional or not because it's not there. Your Honor, I think this might lead a little bit into the issues of damages, but Claim 19 is a method claim. And so it's different in scope in a number of respects, but it's different in scope, at least in as much as the kind of infringer is different. For a method claim, we might not have the same claim for infringement against you cloudlink. But are you saying that to the extent the specification says that non-local cause database is optional, that it's only optional for systems claims and wouldn't, that that optionality wouldn't cover whether you're claiming systems versus methods? No, not at all. I think our position is that the device described in the specification may or may not include in its memory a non-local cause database. A method claiming the use of a device as described may be a method for using a device that has the database, maybe a method for using the device that doesn't have the database. So the method claim versus apparatus claim is not the thing that drives the optionality. The optionality comes from the explicit disclosure in the specification, which says in some embodiments, there is no non-local cause database. As I was mentioning before, the other side of the coin with you cloudlink proposal is that by requiring a non-local cause database, it is contrary to this course precedent in, for example, OD versus IPS, which is in our brief at page 30, that it is improper in general as possible to construe claims in a way to exclude embodiments of the patent. And this one's a little bit confusing because you're excluding an embodiment that lacks a non-local cause database, but it is contrary to this course precedent on that as well. I also think it's important to note that our proposed construction where non-local cause database is not required is consistent with the way the rest of the claim is written. The questions on remand touched on this a little bit, but we don't know what a non-local cause database is or does in the context of the claim. And the reason for that is because it's never mentioned again in claim eight or any of the dependent claims from claim eight. So we don't... Councilman Pawlik, I have a little damages question for you. Okay. In the blue brief in footnote five, Pawlik, I'm quoting, ignored the fact Pawlik only makes approximately $3.50 in revenue for selling data to customers, which means CMO's $3 royalty rate is effectively an 86% royalty. Is that true? Are the facts underlying that statement true or is it true that we're asking for an 86% royalty? Both. I believe the testimony that is cited there, that is a trial transcript citation. So that's a citation that was made to evidence the jury heard, and we have no reason to doubt that that's true. And the math I think is correct. Three is 86% of $3.50. But still in all, that's part of the overall evidentiary package the jury heard when deciding whether or not Mr. Martinez's royalty presentation was correct. And I'd refer the court back to the Asetek case, which is cited in the sentence right after footnote five. That's a case cited by you Cloudlink in support of this argument. But Asetek essentially stands for the proposition that even if a royalty rate approximates a plaintiff's profits, that's not per se impermissible. And indeed in some instances, Asetek tells us that's exactly what a hypothetical negotiation would lead to. That case says at 852, Fed Third, 13, 13, 50, 63, I'm sorry. It says, quote, negotiating for a per unit payment equal to its per unit profit can be a logical approach for a patent owner that is uncertain of how many sales might be lost. So that case cited by you Cloudlink stands for exactly the proposition that Mr. Martinez advocated, which is the profit margin is a useful tool in determining what the reasonable loyalty is. Another important- Did you have to make an argument that CMO was entitled to convoy to sales of day passes? We did not, Your Honor. In our view, this issue is a little bit murky in the you Cloudlink briefs because data services are not a convoy sale. This comes back a little bit to the question of the apparatus versus method claim. And if you think about the claim as an apparatus claim, the sale of the device is an infringing sale. There's stipulations of that effect. The use of a device by a customer of you Cloudlink would also be an active infringement because they are using a device, which is an infringing device. So we're not talking about a convoy sale where, for example, we have the load straps and the dock leveler from some of the seminal case law on this convoy sales point. We're talking about two acts of infringement occurring because of one, the sale of the device and two, the use of the device. But even more importantly than that, the question under 284 from the Western GCO case and other cases of its progeny is what is the economic impact of the active infringement? And here we have admissions stipulations as to the underlying active infringement by you Cloudlink, both in the form of direct infringement through sales and induced infringement through sales abroad and usage in the United States. The question is what is the economic impact of that sale? The answer can't be anything other than the users of the device consume data. If they don't do that, devices are paperweights. Council, can we go back to where Judge Toronto started the argument with your that we would believe that, that the claim construction is wrong. What is your position on remand versus reversal? I mean, these were cross motions for summary judgment. Discovery was closed. I mean, if there was an argument to be made that, and you didn't know at the time what the court's construction was going to be, if there, if there was an argument to be made under an alternative construction, shouldn't you have had to make it then? Your Honor, I think this is a bit of an abnormal situation. And I haven't studied Judge Rakoff's order on this exact point today or yesterday, but I believe what Judge Rakoff said is he, he sort of indicated the delay on you cloud link side and bringing this issue to the forefront. So it's true that that issue of whether the nonlocal call database is a limitation was briefed in summary judgment, but that was often after fact discovery was done. That was after expert discovery was done. And even in coming to that claim construction, Judge Rakoff expressed some dismay about how late in the process that was. But this is just Toronto, but I, unless I missed something, when I read your opposition to the other side, summary judgment motion on this point, I do not remember seeing you making an argument that because of the late arising nature of this issue, or for any other reason that you would need more discovery or would need a claim construction on nonlocal calls database in order to answer the question, whether if such a database is required, you can find them in the accused products. That's correct, Your Honor. I think at that point, Mr. Dr. Clark's testimony about the confusion that was addressed with Mr. That was what we had relied on at that point. The problem I have with that is, as far as I understand that, that's the only thing you relied on. And what you can't find in that single question and answer is a direct declarative statement that, yes, there is a nonlocal calls database in at least one or more of the accused products. Yeah, I think I agree with you. I think what Dr. Clark says there is I don't know what nonlocal calls database is. So there might be. And that's the fundamental problem we have here. And it gets back to my point about nonlocal calls database not being mentioned anywhere else in the claim. Even if it is a limitation to the claim, we don't know what it means. There hasn't been a fact finding because nobody knows what it means at this point. We know what the specification says about it, but nowhere else in the claims that were asserted and stipulated to infringement was there a discussion of what the nonlocal calls database does, is, looks like. There was some commentary about, you know, phone calls and what is a call. I think that Mr. Dragstaff's example is not really the pertinent example of another possible alternative for a call. In the world we're in, Skype is a thing. Zoom is a thing. People have Skype phone numbers. But those are all voice over IP calls. Those are all data packets transferred over the Internet, converted from voice to data and data back to voice. Those are calls. And that's an example of the kind of issues that need to be resolved on the dispute. Can I just add one question about the foreign damages? Why am I wrong, would I be wrong, in thinking that even if the foreign data use could properly, under Western GECO, Supreme Court Western GECO and so on, be a legitimate part of the assessment of the royalty for the domestic sales? Why isn't there a jury trial right to the resolution of the issue? Because it seems like there are fact questions. Your Honor, in our view, and I think that our brief made this fairly clear, the issue of the royalty rate to be applied to both domestic and foreign damages, if you will, was an issue tried to the jury. Mr. Martinez gave testimony about what the royalty rate would be for domestic only determinations and said it would be lower if a full kind of global determination were made. And the number that the jury adopted was his lower number for a negotiation that took into account domestic and foreign applications. So I don't think there's been any problem with it. Mr. Weed, you didn't reserve any time for Ms. Johnson, but there was a specific request that she be given two minutes. Why don't we give her two minutes and I'll give Mr. Dragseth an extra two minutes on what's left of his rebuttal. That sounds good. Thank you, Your Honor. Would you like me to finish answering that question? No, I think we're going to have to move on. Okay. Your Honors, may it please the court, Gina Gennaro Johnson of KNL Gates on behalf of CMO Holdings Inc. I wanted to start with whether the jury heard substantial direct evidence that CMO notified UCI Link of its charges of infringement of the 689 patent prior to asserting the 689 patent. We contend that there was substantial direct evidence to this point. In fact, Mr. Martinez testified to this point and the jury instructions noted that the damages period began prior to the filing of the 689 complaint because of it. This is the one week prior? That's correct, Your Honor. And Mr. Martinez's testimony was unrebutted and not cross-examined. Do you think that pre-complaint willfulness is necessary under HALO and the law of willfulness? And I'm not sure why it would be. Your Honor, I do not believe that that's necessary. If we look at the HALO case, what is at the core of the inquiry is culpability, and culpability can arise pre- or post-suit because the scienter requirement is the same in either instance here. We do need to look at the totality of the circumstances in either case pursuant to the WCM case, and I would contend, Your Honor, that our case is not different from the WCM case. In the WCM case, the patents were initially asserted in a different district. That case was dropped, and then the patents were asserted in another district just one month later. And so CMO's filing of the 689 complaint subsequent to its decent assist letter is a very similar issue, albeit a shorter period of time in between. Is knowledge of a parent patent enough? I would contend, Your Honor, that knowledge of a parent patent is enough, especially under the circumstance when the patent application had been made public for four years at the time at which Zhang Rongrong, UCloud Link's 30b6 witness, testified Dr. Gong became aware of the parent patent. And I think this issue is touched on precisely in footnote 4 of the WCM case, and that is why UCloud Link's discussion of the state industry's case does not apply here. Okay. One last question. The parties seem to argue or seem to believe in their arguments that knowledge is enough for willfulness. But is it more needed? Knowledge of the patent is the baseline that's required, and we believe that's satisfied by the decent assist letter that was sent on August 13th. In addition, I would agree that a totality of the circumstances approach requires more than just knowledge, and that's precisely why we take the totality of the circumstances approach. An infringer who first learns of the patent in the context of litigation and has no prior history with the plaintiff is much different than UCloud Link, an infringer who admittedly knew of CIMO's patent, monitored its product, and whose technical documents share exact figures with CIMO's technology. So we do not have the case here, Your Honor, where the jury heard nothing but UCloud Link's knowledge of the patent. In fact, that's why the testimony surrounding Rong Rong Zhang's admission of knowledge of the 735 patent and Wong Bin's testimony regarding transferring documents embodying CIMO's technology over to UCloud Link's computer are relevant to the overall inquiry and not substantially more prejudicial than probative. Okay, Ms. Johnson. Thank you very much. Thank you. As Mr. Dragseth said, it's getting to be a long morning, so we need to move on. Great. I only have... I gave you two extra minutes, but you don't have to use it. I have some quick bullet points. I think the ordinary meaning is our meaning. That's the only one that's been discussed. It's provided by SuperGuide, and we didn't hear anything more on that. The antecedent... Mr. Dragseth, I'm sorry to drag this out. Isn't the other side's view of this, of the claim construction, doesn't it amount to putting the single letter word A in front of memory and in front of non-local calls database, and then you have a list of things, some of which are singular, some of which are plural, and at that point what comes after the at least one makes perfect sense, a plurality of the two things that are listed as plural. So with a pretty small bit of surgery, we would have a claim that is actually in standard English, and then that would support their view and not your view. So I have a response to that on the SuperGuide point, and then another on what's called the antecedent basis point that you had brought up and have some discussion with our opposing counsel with. On the SuperGuide point, no, I don't think that's a small change. The term memory, as they've said multiple times, is a group noun, same with communication circuitry. So there's no need. If you want to put A in there, you are rewriting the claim. That's a given. And that is verboten except in the most extreme circumstances. It is not a problem. Memory is not singular. All right? The word is single, but it's a group noun, and so within it, it can have plural, especially in claim drafting. You say first memory storing commands to do X, second memory storing commands to do Y, and then you can have plurality of memory. To say a plurality of memories is not something you see often in claims. So I don't think that that's an issue. How do we deal with the fact that, as your friend on the other side contends, we're reading the claim to exclude one of the described embodiments? All right. A few points. Number one, there is no exclusion of a preferred embodiment. This is an optional situation. Nothing was listed here as preferred. There is actually, I would say, not even an exclusion of an embodiment as that term is used in the prior case. Isn't that exactly what happened in ODI? No. ODI didn't have one of these optional terms where it said, well, you can have A or not have A. I don't think that was the facts in ODI. And there's another distinction over ODI, and we make it in the brief, is that in ODI there weren't other claims. So really you said, well, it looks to us like he's trying to get everything with claim one. I forget what number it was in ODI, but let's just say claim one. So we need to construe that claim so that he gets everything. But as the court has said subsequently, well, if there's a reason to think that the inventor wasn't trying to get everything with claim eight, like they're reciting that feature missing from other claims, and it doesn't have to be only that feature that comes out of the claim, but if there isn't a reason to necessarily conclude he's trying to get everything in his disclosure, then we don't do it. And that's why we have doctrines of disclosed but not claimed. In RE service, there was an aluminum. I forget what the two embodiments were, the aluminum and something else. So you had an alternative. You could use aluminum or steel. Well, they claimed one of them. There wasn't a holding there that that was verboten and we're going to have it cover both. They said, you know what? You claimed aluminum. That's what you get under the plain language of the claim. And in fact, even worse for them, you've disclaimed the other material, the steel. So there's nothing in the case law that prevents a construction like ours. Further on your question, they cited ruckus, which I don't see in the briefs, so I'll throw out another case in the briefs, ruckus for the idea that, well, you can't have an enabling, you know, you have to construe so that you don't have a 112 problem. The court has held other ways where the claim language is clear, where there is an ordinary meaning for the claims, and I'll just throw out lizard tech as one example where the court said, listen, if you got a 112 problem, litigate it further somewhere else. And then just really quickly on remedy, you should look at A76 where the court talked about how much blame each party had for when the issues came up. And I think Judge Toronto has his finger on whether there was a request for extra discovery, whether there was a request for extra experts, or so on. There wasn't. And that is all I have unless the court has questions. No, I don't think so. I don't hear anything. The case will be submitted. Thank you.